## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
### Case No. 4:23-CV-84

WAYNE MCDONALD )
as Administrator of the Estate of )
Ronald Anthony McDonald, )
  )
    Plaintiff, )
  )
vs. )          **COMPLAINT**
  )    **(Jury Trial Demanded)**
HALIFAX COUNTY, M'BECHI )
TYREE DAVIS, in his official )
capacity as Sheriff of Halifax )
County, WESTERN SURETY )
COMPANY, DAVID A. FOLTZ, )
in his individual capacity, )
SILVESTER HARDY, in his )
individual capacity, COREY R. )
JOHNSON, in his individual )
capacity, GRAVINO LASHUON )
TAYLOR, in his individual )
capacity, SOUTHERN HEALTH )
PARTNERS, INC., JILL F. )
COSTON, LPN, in her individual )
capacity, KAYLA A. SHEARIN, )
LPN, in her individual capacity, )
and BOBBIE LOWE, LPN, in her )
individual capacity, )
  )
    Defendants. )

---

NOW COMES Plaintiff, complaining of Defendants, and alleges and says as follows:

## INTRODUCTION

1. On the morning of Tuesday, May 4, 2021, Ronald Anthony McDonald, age 70, was arrested by the Roanoke Rapids Police Department while in an acute psychotic state and brought to the Halifax County Detention Center in Halifax, NC.

2. Mr. McDonald suffered from serious mental illness, including bipolar disorder, depression, anxiety, and schizophrenia, and his mental health had significantly deteriorated following his wife's death on March 21, 2021.

3. The Halifax County detention staff admitted Mr. McDonald to the Detention Center under a $500 secured bond and placed him in Single Cell #2, a segregation cell.

4. Although the Halifax County detention staff and the Southern Health Partners nursing staff were required to complete a medical screening and a mental health screening, Lieutenant Corey R. Johnson and Bobbie Lowe, LPN did not complete the mandatory screenings on May 4 and May 5 due to Mr. McDonald's severe agitation. Mr. McDonald was not referred for, and did not receive, a medical or mental health evaluation.

5. During the next two weeks, Mr. McDonald exhibited obvious signs of manic psychosis and delirium, and he was experiencing a psychiatric emergency. Despite his serious medical needs, the detention staff and nursing staff did not contact the Southern Health Partners medical director or medical team administrator, the mental health contractor, Halifax County EMS, and/or any other

2

health care providers. No one obtained any medical or mental health care for Mr. McDonald.

6. Due to his untreated psychiatric condition, by Sunday, May 16, 2021, Mr. McDonald had completely stopped taking his medications for hypertension and he had stopped eating and drinking. During the next three days, Mr. McDonald's condition deteriorated and he lay or sat naked in cold water, feces, and urine on the floor of the cell in an altered mental state without receiving any medical or mental health care.

7. At 12:44 p.m., on Wednesday May 19, 2021, the detention staff contacted 911 about Mr. McDonald's condition and Halifax County EMS responded to the Detention Center within 10 minutes. The EMTs found Mr. McDonald lying naked in a fetal position on his right side under the bunk on the cell floor in a pool of cold water, feces, and urine, approximately two inches deep. Mr. McDonald was severely hypoglycemic, dehydrated, and hypothermic, his skin was peeling and bluish (cyanotic), and he was moaning and having difficulty breathing with an altered level of consciousness. He had lost nearly 40 pounds since he was admitted to the Detention Center.

8. At approximately 1:16 p.m. on May 19, 2021, Mr. McDonald went into cardiac arrest shortly after being placed onto the ambulance. He never regained consciousness before he was pronounced dead less than two hours later at Halifax Regional Medical Center in Roanoke Rapids, NC. Mr. McDonald died from complications due to hypoglycemia, hypothermia, and hypertension.

3

9. Plaintiff, as the Administrator of the Estate of Ronald Anthony McDonald, brings this civil action, pursuant to 42 U.S.C. § 1983, against (a) the individual Defendants for deliberate indifference to the serious medical needs of Mr. McDonald in violation of his substantive due process rights under the Fourteenth Amendment, and (b) Defendants Halifax County and Sheriff Davis, as the successor to Sheriff Tripp, for their respective policies and/or customs of deliberate indifference to the serious medical needs of inmates, like Ronald Anthony McDonald, with serious mental illness and emergency medical needs.

10. Plaintiff also brings claims under North Carolina law, including: (a) an official bond action, under N.C. Gen. Stat. § 58-76-5 against Defendants Sheriff Davis, as the successor to Sheriff Tripp, and Western Surety Company, (b) a medical malpractice action against Defendants Southern Health Partners, and the individual LPNs, and (c) a corporate negligence action against Defendant Southern Health Partners.

11. Plaintiff seeks to recover compensatory damages from Defendants for Mr. McDonald's personal injuries and wrongful death. Plaintiff also seeks to recover punitive damages from Jail Administrator Foltz, Lieutenant Johnson, LPN Coston, and LPN Shearin under federal law.

## JURISDICTION AND VENUE

12. Plaintiff, as Administrator of the Estate of Ronald Anthony McDonald, brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Mr. McDonald of his due process rights as a

pretrial detainee to be free from deliberate indifference to his serious medical needs under the Fourteenth Amendment to the United States Constitution.

13.     Plaintiff's action arises under the Constitution and laws of the United States.

14.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

15.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of North Carolina because all of the events giving rise to this action occurred in the Eastern District.

17.     The Eastern Division is the proper division for this case in the Eastern District of North Carolina.

18.     This is a wrongful death action under N.C. Gen. Stat. § 28A-18-2 to recover damages for Mr. McDonald's wrongful death.

19.     This is also a survival action under N.C. Gen. Stat. § 28A-18-1 to recover damages for Mr. McDonald's personal injuries.

<u>**PARTIES**</u>

**A.     Plaintiff**

20.     Plaintiff Wayne McDonald is a resident of Wake County, NC.

21.     Plaintiff is the Administrator of the Estate of Ronald Anthony McDonald. Plaintiff was duly appointed Administrator of the Estate by the Clerk of Superior Court in Halifax County file no. 22-E-426.

5

22. Plaintiff is the brother of the late Ronald Anthony McDonald ("Ronald McDonald" or "Mr. McDonald"), also known as "Buck" McDonald.

23. Ronald McDonald was a black man who was born in February 1951 in Washington, D.C. He was 70 years old when he died in Halifax County on May 19, 2021.

24. Mr. McDonald was married to Sharon Pitts McDonald, until her death on March 21, 2021.

25. Mr. McDonald was not survived by a spouse, a child, any lineal descendants of a deceased child, or his parents.

26. Mr. McDonald's heirs at law are his two brothers, Wayne McDonald and Wendell McDonald, and the lineal descendants of his deceased sister, Jean McDonald, and deceased brother, James McDonald.

**B.    Halifax County, Sheriff Davis, and Western Surety Company**

27. Defendant Halifax County is a county in North Carolina organized and existing under N.C. Gen. Stat. § 153A-10, and it has all of the corporate powers set forth in N.C. Gen. Stat. § 153A-11, including the power to be sued.

28. Halifax County is a "unit" and "local government" under N.C. Gen. Stat. § 153A-216, *et seq.* It has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail.

29. Halifax County maintains and operates the Halifax County Detention Center, located at 2355 Ferrell Lane, Halifax, NC 27839. The Detention Center is designed to house 85 inmates (77 male beds and 8 female beds).

6

30.     In April and May 2021, the average daily inmate population at the Halifax County Detention Center was 79 inmates.

31.     Halifax County is responsible, under N.C. Gen. Stat. § 153A-225, for developing an adequate medical plan to provide medical care to inmates at the Halifax County Detention Center, including the medical supervision of inmates and emergency medical care for inmates to the extent necessary for their health and welfare. *See Stockton v. Wake County*, 173 F.Supp.3d 292, 303-04 (E.D.N.C. 2016).

32.     Pursuant to 10A NCAC §14J.1001, the written medical plan must include policies and procedures that address the medical and mental health screening of inmates upon admission and handling emergency medical needs, including mental health.

33.     At the time of the events alleged herein, Halifax County had a Medical Plan at the Detention Center that was adopted by the County on October 10, 2013 after consultation with the Sheriff, county jail physician, county health director, and county Board of Health. The Medical Plan was based on the National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails that were in effect in 2013.

34.     The Medical Plan had not been updated by Halifax County to comply with the 2018 NCCHC Standards for Health Services in Jails or the new North Carolina Minimum Jail Standards that were adopted by the State, effective September 4, 2020.

7

35. At all times relevant to this action, Halifax County had final policymaking authority over the provision of medical care and emergency medical care, including mental health care, to inmates at the Halifax County Detention Center. *See Vaught v. Ingram*, 2011 U.S. Dist. LEXIS 18231 at [*8-12], No. 5:10-CT-3009-FL (E.D.N.C. 2011).

36. Halifax County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the serious medical needs of inmates, like Ronald McDonald, with serious mental illness and emergency medical needs at the Halifax County Detention Center.

37. Defendant M'Bechi Tyree Davis ("Sheriff Davis") is a resident of Halifax County, NC.

38. Sheriff Davis is the duly elected Sheriff of Halifax County and he has been the Sheriff since July 2022.

39. Sheriff Davis is sued in his official capacity as the successor to Sheriff Samuel W. Tripp, Jr. ("Sheriff Tripp").

40. At all times relevant to this action, Sheriff Tripp was the duly elected Sheriff of Halifax County and responsible for the care and custody of the inmates at the Halifax County Detention Center under N.C. Gen. Stat. § 162-22.

41. Sheriff Tripp had an affirmative nondelegable duty to provide medical care, including mental health care, for inmates at the Halifax County Detention Center under N.C. Gen. Stat. § 153A-221. *See State v. Wilson*, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007).

8

42.     In addition, Sheriff Tripp was responsible for appointing, employing, training, and supervising the detention officers at the Halifax County Detention Center.

43.     At the times of the events alleged herein, the Halifax County Detention Center had a Policies and Procedures Manual which contained policies and procedures that were approved by Sheriff Tripp in May 2014 and July 2016. The policies and procedures had not been updated by Sheriff Tripp to comply with the North Carolina Minimum Jail Standards, effective September 4, 2020.

44.     Under Policy No. 2.03, Sheriff Tripp had the sole authority to appoint a Jail Administrator at the Halifax County Detention Center who would have full responsibility for management and operation control of the Detention Center with absolute control over and direct responsibility for the safety, security, health, welfare, work, and rehabilitation of inmates confined in the facility.

45.     Under Policy No. 1.05, Sheriff Tripp authorized the Jail Administrator to establish policy on the Sheriff's behalf at the Halifax County Detention Center and to determine the procedures that would be followed to accomplish the mission of the detention facility.

46.     At the time of the events alleged herein, Sheriff Tripp had appointed Major David A. Foltz to serve as the Jail Administrator and Keeper of the Halifax County Detention Center, pursuant to N.C. Gen. Stat. § 162-22.

9

47.     Jail Administrator Foltz was responsible for the operation of the Halifax County Detention Center and the provision of medical and mental health care to inmates, including Ronald McDonald.

48.     At all times relevant to this action, Sheriff Tripp and Jail Administrator Foltz had final policymaking authority at the Halifax County Sheriff's Office for the provision of medical care and mental health care to inmates at the Halifax County Detention Center.

49.     At all times relevant to this action, Sheriff Tripp and Jail Administrator Foltz had final policymaking authority at the Halifax County Sheriff's Office for the training and supervision of the detention officers at the Halifax County Detention Center.

50.     Sheriff Davis, as the successor to Sheriff Tripp, is sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference at the Halifax County Sheriff's Office to the serious medical needs of inmates, like Ronald McDonald, with serious mental illness and emergency medical needs at the Halifax County Detention Center.

51.     Sheriff Davis, as the successor to Sheriff Tripp, is also sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the inadequate training of detention officers at the Halifax County Detention Center on handling inmates with serious medical illness and emergency medical needs.

52.     At all times relevant to this action, Sheriff Tripp had an official bond that was issued by Western Surety Company in the amount of $25,000 as required by N.C. Gen. Stat. § 162-6.

10

53.     Sheriff Davis is sued in his official capacity under N.C. Gen. Stat. § 58-76-5 as the successor to Sheriff Tripp as the principal on the official bond.

54.     Sheriff Davis, in his official capacity, has waived governmental immunity for Plaintiff's claim under N.C. Gen. Stat. § 58-76-5 to the extent of Sheriff Tripp's bond.

55.     Defendant Western Surety Company is a South Dakota corporation that is duly licensed to conduct business in the State of North Carolina.

56.     Western Surety Company is sued as the surety on Sheriff Tripp's official bond, pursuant to N.C. Gen. Stat. § 58-76-5.

## C.     Detention Officers

57.     Defendant David A. Foltz is a resident of Halifax County.

58.     At the time of the events alleged herein, Defendant Foltz was employed by the Halifax County Sheriff's Office as a detention officer with the rank of Major and the position of Jail Administrator.

59.     Defendant Silvester Hardy is a resident of Nash County.

60.     At the time of the events alleged herein, Defendant Hardy was employed by the Halifax County Sheriff's Office as a detention officer with the rank of Captain and the position of Chief Jailer. In his position as Chief Jailer, Defendant Hardy assisted the Jail Administrator with the daily operations at the Detention Center.

61.     Defendant Corey R. Johnson is a resident of Halifax County.

11

62.     At the time of the events alleged herein, Defendant Johnson was employed by the Halifax County Sheriff's Office as a detention officer with the rank of Lieutenant and he worked on the dayshift from 7:00 a.m. until 7:00 p.m.

63.     Defendant Johnson was responsible for directly supervising the detention officers at the Detention Center during the dayshift.

64.     Defendant Gravino Lashuon Taylor is a resident of Halifax County.

65.     At the time of the events alleged herein, Defendant Taylor was employed by the Halifax County Sheriff's Office as a detention officer with the rank of Lieutenant and he worked on the nightshift from 7:00 p.m. until 7:00 a.m.

66.     Defendant Johnson was responsible for directly supervising the detention officers at the Detention Center during the nightshift.

67.     At all times relevant to this action, Defendants Foltz, Hardy, Johnson, and Taylor were acting under color of state law as detention officers employed by the Halifax County Sheriff's Office.

68.     Defendants Foltz, Hardy, Johnson, and Taylor are each sued in their individual capacity under 42 U.S.C. § 1983.

69.     During their interactions with Ronald McDonald, as alleged herein, Defendants Foltz, Hardy, Johnson, and Taylor acted in accordance with the policy or custom at the Halifax County Sheriff's Office of deliberate indifference to the serious medical needs of inmates with serious mental illness and emergency medical needs at the Detention Center.

**D.      Southern Health Partners and LPNs**

70.      Defendant Southern Health Partners, Inc. ("Southern Health Partners") is a Delaware corporation.

71.      Southern Health Partners maintains a registered office in Wake County, NC and its principal place of business is located in Chattanooga, Tennessee.

72.      Southern Health Partners is a private for-profit corporation that is in the business of providing correctional health care services under contract with local governments.

73.      Southern Health Partners operates in over 250 correctional facilities in 14 states, including North Carolina, and provides correctional health services at approximately 60 detention facilities in North Carolina.

74.      At all times relevant to this action, Southern Health Partners provided medical, dental, and mental health services to inmates at the Halifax County Detention Center under a Health Services Agreement, dated May 1, 2019 between Halifax County and Southern Health Partners, Inc. ( "Health Services Agreement"). The Health Services Agreement was approved by Sheriff Tripp.

75.      Under the Health Services Agreement, Southern Health Partners agreed to provide medical, dental, and mental health services to inmates at the Halifax County Detention Center from July 1, 2020 through June 30, 2021 in exchange for a base compensation of $26,445.25 per month ($317,343.00 per year) for an average daily inmate population of up to 100.

76.     The terms of the Health Services Agreement required Southern Health Partners to perform the following services at the Halifax County Detention Center:

a.  Provide for the delivery of medical, dental and mental health services to inmates of the jail;

b.  Provide and/or arrange for professional medical, dental, mental health and related health care and administrative services for the inmates, regularly scheduled sick call, nursing care, regular physician care, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management, pharmacy services management, administrative support services, and other services described in the Agreement;

c.  Be financially responsible for the costs of all physician and nurse staffing, over-the-counter medications, medical supplies, on-site clinical lab procedures, medical hazardous waste disposal, office supplies forms, folders, files, travel expenses, publications, administrative services and nursing time to train officers in the jail on various medical matters;

d.  Arrange and/or provide to inmates at the jail specialty medical services to the extent such are determined to be medically necessary by Southern Health Partners;

e.  Arrange and/or provide emergency medical care, as medically necessary, to inmates through arrangements to be made by Southern Health Partners;

f.  At its own cost, arrange for medical services for any inmate who, in the opinion of the Medical Director (hereinafter meaning a licensed SHP physician) requires such care, subject to an $80,000 cost pool limitation;

g.  Provide medical and support personnel reasonably necessary for the rendering of health care services to inmates at the jail, including:

    i.   An onsite nursing staffing plan averaging twelve (12) hours per day, seven (7) days per week, plus a Registered Nurse (RN) for up to four (4) hours per week;

    ii.  A Qualified Mental Health Professional (either a psychiatric-RN, Social Worker or Licensed Professional Counselor) for up to two (2) hours every other week (either on-site or via tele-health platform); and,

14

iii. A Professional Provider (either a physician or mid-level practitioner) available to the nursing staff for resource, consultation and direction twenty-four (24) hours per day, seven (7) days per week;

h. Maintain a complete and accurate medical record for each inmate who has received health care services, which shall be available, at all times, to Halifax County as custodian of the person of the patient; and,

i. Provide regular reports to Halifax County relating to services rendered under the Agreement.

77. At all times relevant to this action, Chanson A. DeVaul, D.O., a family medicine physician at Wilson Intermediate Care, was the Medical Director for Southern Health Partners at Halifax County Detention Center and various other detention centers in North Carolina.

78. Dr. DeVaul's office was located an hour away from the Halifax County Detention Center and, upon information and belief, he visited the Detention Center one day per week, usually on Mondays, for up to two hours.

79. At all times relevant to this action, Jennifer Tanner, RN was the Medical Team Administrator for Southern Health Partners at the Halifax County Detention Center and various other detention centers in North Carolina.

80. Nurse Tanner was the only RN at the Halifax County Detention Center and she was present at the Detention Center one day per week for up to four hours.

81. Under the Health Services Agreement, Southern Health Partners did not have any nursing staff present at the Detention Center during the nightshift and limited staff present during the dayshift on weekends. The nursing care was primarily provided by licensed practical nurses (LPNs) without any onsite medical

supervision unless Nurse Tanner was present. Dr. DeVaul did not supervise the nursing staff.

82.     Southern Health Partners was aware that the LPNs at the Detention Center had inadequate training, supervision, and education to properly screen, assess, and obtain treatment for inmates with serious mental illness.

83.     Defendant Jill F. Coston, LPN (referred to herein as "Coston" or "LPN Coston") is a resident of Halifax County.

84.     At all times relevant to this action, LPN Coston was a duly licensed practical nurse (LPN) who was approved to practice certain assigned nursing activities and responsibilities, as set forth in N.C. Gen. Stat. § 90-171.20 and 21 N.C. Admin. Code § 36.0225, under the supervision of a registered nurse, advanced practice registered nurse, licensed physician, or other healthcare practitioner authorized by the State.

85.     Defendant Coston has been licensed as an LPN in North Carolina since March 2005.

86.     At the time of the events alleged herein, LPN Coston was employed by Southern Health Partners as an LPN at the Halifax County Detention Center. LPN Coston was the Medical Services Coordinator (MSC) for Southern Health Partners at the Detention Center.

87.     In her capacity as the MSC, LPN Coston was responsible for managing and supervising the nursing staff and contacting the Medical Team Administrator, Medical Director, mental health contractor, and other health care personnel,

16

including emergency medical services, as needed for inmates with medical and mental health needs.

88.    LPN Coston was acting within the course and scope of her employment with Southern Health Partners during her care and treatment of Mr. McDonald.

89.    At all times relevant to this action, LPN Coston was acting under color of state law as a licensed practical nurse employed by Southern Health Partners at the Halifax County Detention Center.

90.    LPN Coston is sued in her individual capacity under 42 U.S.C. § 1983.

91.    Defendant Kayla A. Shearin, LPN (referred to herein as "Shearin" or "LPN Shearin") is resident of Halifax County.

92.    At all times relevant to this action, LPN Shearin was a duly licensed practical nurse  who was approved to practice certain assigned nursing activities and responsibilities, as set forth in N.C. Gen. Stat. § 90-171.20 and 21 N.C. Admin. Code § 36.0225, under the supervision of a registered nurse, advanced practice registered nurse, licensed physician, or other healthcare practitioner authorized by the State.

93.    Defendant Shearin has been licensed as an LPN in North Carolina since August 2019.

94.    At the time of the events alleged herein, LPN Shearin was employed by Southern Health Partners as an LPN at the Halifax County Detention Center. LPN Shearin was directly supervised by LPN Coston.

95.    LPN Shearin was acting within the course and scope of her employment with Southern Health Partners during her care and treatment of Mr. McDonald.

96. At all times relevant to this action, LPN Shearin was acting under color of state law as a licensed practical nurse employed by Southern Health Partners at the Halifax County Detention Center.

97. LPN Shearin is sued in her individual capacity under 42 U.S.C. § 1983.

98. Upon information and belief, Defendant Bobbie Lowe, LPN (referred to herein as "Lowe" or "LPN Lowe") is a resident of Tehama County, CA.

99. At all times relevant to this action, LPN Lowe was a duly licensed practical nurse, with a multistate license issued in Tennessee, who was approved to practice certain assigned nursing activities and responsibilities, as set forth in N.C. Gen. Stat. § 90-171.20 and 21 N.C. Admin. Code § 36.0225, under the supervision of a registered nurse, advanced practice registered nurse, licensed physician, or other healthcare practitioner authorized by the State.

100. Defendant Lowe has been licensed as an LPN with a multistate license in Tennessee since July 2000.

101. At the time of the events alleged herein, LPN Lowe was employed by Southern Health Partners as an LPN at the Halifax County Detention Center. LPN Lowe was directly supervised by LPN Coston.

102. In the alternative, if LPN Lowe was an independent contractor, Southern Health Partners held itself out as providing nursing services at Halifax County Detention Center through its apparent agent, LPN Lowe, when she was working with the nursing staff at the Detention Center.

103. LPN Lowe was acting within the course and scope of her employment or independent contract with Southern Health Partners during her care and treatment of Mr. McDonald.

104. At all times relevant to this action, LPN Lowe was acting under color of state law as a licensed practical nurse employed or contracted by Southern Health Partners at the Halifax County Detention Center.

105. LPN Lowe is sued in her individual capacity under 42 U.S.C. § 1983.

106. Defendants Coston, Shearin, Lowe, and Southern Health Partners were Ronald McDonald's treating health care providers at the Halifax County Detention Center.

107. At all times relevant to this action, LPN Coston, LPN Shearin, and LPN Lowe were health care providers as defined in N.C. Gen. Stat. § 90-21.11.

108. In addition to Plaintiff's civil rights claims, this is a medical malpractice action under North Carolina law alleging that LPN Coston, LPN Shearin, and LPN Lower failed to comply with the applicable standard of care under N.C. Gen. Stat. § 90-21.12(a) in their care and treatment of Mr. McDonald.

109. The medical care provided to Mr. McDonald by LPN Coston, LPN Shearin, and LPN Lowe, and all medical records pertaining to the alleged negligence and gross negligence that are available to the Plaintiff after a reasonable inquiry, have been reviewed by a board-certified family medicine physician, a board-certified psychiatry physician, and a board-certified family nurse practitioner who are each reasonably expected to qualify as an expert witness under Rule 702 of the North

Carolina Rules of Evidence and are each willing to testify that the medical care provided by LPN Coston, LPN Shearin, and LPN Lowe did not comply with the applicable standard of care for a licensed practical nurse.

110. Defendant Southern Health Partners is sued under North Carolina law, pursuant to the doctrine of Respondeat Superior, for the medical malpractice by Defendants Coston, Shearin, and Lowe. In the alternative, Defendant Southern Health Partners is sued pursuant to the doctrine of apparent agency for the medical malpractice by Defendant Lowe.

111. In addition, Defendant Southern Health Partners is sued under North Carolina law for corporate negligence.

## FACTUAL ALLEGATIONS

112. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

### A. Background Information

113. Ronald Anthony McDonald was born in February 1951 in Washington, D.C. His parents were James McDonald and Mildred Powell, and he had three brothers and one sister. Mr. McDonald grew up with his family in Washington, D.C.

114. During his adult years, Mr. McDonald worked in park service and landscaping jobs. In or around 1998, he began receiving social security disability benefits due to problems with his back.

115. In 2000, Mr. McDonald moved to the Town of Enfield in Halifax County, NC. After moving to North Carolina, Mr. McDonald met Sharon Pitts and they were married in or around 2003.

20

116.   Mr. McDonald had serious mental illness, including bipolar disorder, depression, anxiety, and schizophrenia. In recent years, Mr. McDonald had prescriptions for Fluoxetine (an antidepressant) and Quetiapine/Seroquel (an antipsychotic), and Risperidone (an antipsychotic).

117.   In addition, he had hypertension (high blood pressure) and took Lisinopril and hydrochlorothiazide (HCTZ).

118.   Mr. McDonald's primary care provider was Med First Immediate Care and Family Practice in Roanoke Rapids. At his last appointment on February 23, 2021, he was 6'0" tall and 284 pounds. He received prescriptions for Lisinopril, HCTZ, and Vitamin D and was referred to pain management for chronic back pain.

119.   On March 21, 2021, Mr. McDonald's wife, Sharon Pitts, died in Halifax County. After her death, Mr. McDonald's mental health significantly deteriorated.

120.   During the early morning hours on Friday, April 16, 2021, Mr. McDonald, age 70, was arrested by the Roanoke Rapids Police Department and charged with second degree trespass. He was booked and admitted to the Halifax County Detention Center under a $1500 secured bond. During booking, Mr. McDonald informed the detention staff that he was handicapped due to back problems, he had pain in his back and left leg, and his wife died one month ago.

121.   On April 20, 2021, LPN Lowe completed a History and Physical examination for Mr. McDonald. During the examination, Mr. McDonald was delusional and cried at times. Mr. McDonald told LPN Lowe that he had a Ph.D. in physics, he was Native American Indian, and his family physician was Keith

McDonald (a nephew who is not a physician) at First Family First in Roanoke Rapids. He also reported that he had prior mental health counseling, a suicide attempt in 2018, took Lisinopril, and was diagnosed with hypertension.

122.    LPN Lowe noted that Mr. McDonald was 6'0" tall, 270 pounds, and did not have diabetes. Mr. McDonald's vital signs were normal, although his blood pressure reading confirmed that he had high blood pressure.

123.    During the examination, LPN Lowe observed that Mr. McDonald was angry and sad about his wife's death and she recommended suicide watch.

124.    Despite his mental health status and history, chronic conditions, and elderly age, LPN Lowe did not refer Mr. McDonald for medical or mental health services and he was not added to the Chronic Care list. In addition, the detention staff did not place him on suicide or special watch.

125.    Mr. McDonald was detained at the Detention Center from April 16 through April 26, 2021, when he was released for time served under a Judgment and Commitment in Halifax County file no. 21 CR 50887.

126.    During his detention, LPN Lowe and LPN Coston noted that Mr. McDonald exhibited signs of psychosis and agitation, including yelling, crying, kicking and hitting the door of his cell, violent outbursts, volatility, anger, and sadness. Mr. McDonald refused to take Ibuprofen on April 22 (a.m.) and Lisinopril on April 25 (p.m.) because he was angry, but was otherwise compliant with his medications.

127.    Due to Mr. McDonald's volatile state, Jail Administrator Foltz asked the detention and nursing staff to not move him from the cell.

128.    Mr. McDonald was not seen by the Medical Team Administrator, Medical Director, or the mental health contractor during this detention. After his release, his mental health did not improve and he was subsequently arrested on May 4, 2021 and taken again to the Halifax County Detention Center.

**B.    Policies and Customs at the Halifax County Detention Center**

129.    Before May 2021, Defendants Halifax County, Sheriff Tripp, and Southern Health Partners were aware that a significant number of inmates at the Halifax County Detention Center had mental health issues and needed to receive appropriate services and treatment, including emergency medical care.

130.    The Health Services Agreement required Southern Health Partners to provide mental health services and a Qualified Mental Health Professional at the Halifax County Detention Center. However, Southern Health Partners did not provide mental health services at the Detention Center, did not have a Qualified Mental Health Professional, and provided inadequate or no mental health training to the LPNs.

131.    Halifax County and Sheriff Tripp knew that Southern Health Partners was not providing mental health services. As a result, Halifax County had a Service Contract, dated June 28, 2018, with Correctional Behavioral Health, PLLC to provide limited mental health services at the Detention Center. Under the Service Contract, Correctional Behavioral Health was required to provide a weekly mental health clinic

23

for new patient assessments and follow-up appointments, weekly consultation with Southern Health Partners nursing staff or the medical director about inmates with serious mental illness, and suicide watch evaluations as needed.

132.    In May 2021, Correctional Behavioral Health provided its mental health services to inmates at the Halifax County Detention Center by videoconference only and did not have any mental health staff present at the Detention Center.

133.    Under the Service Contract, the Halifax County medical/nursing staff or detention officers were required to place inmates on a mental health list in order to be seen for mental health services. Correctional Behavioral Health was not responsible for providing mental health care or services to an inmate until it received the mental health list with the inmate's name.

134.    At all times relevant to this action, Halifax County, Sheriff Tripp, and Southern Health Partners were aware that mental health services would only be provided to inmates at the Detention Center if the inmate was referred for mental health services and placed by the nursing or detention staff on the mental health list for Correctional Behavioral Health.

135.    Pursuant to 10A NCAC §§14J.1001-.1002, Policy 10.31 ("Receiving Screening") of the Medical Plan required detention officers to complete a Medical Receiving Screening during booking before the inmate was classified for housing at the Halifax County Detention Center. The Medical Receiving Screening consisted of Officer Observations, Medical Observations, Medical Questionnaire, Mental Health

Screening, and a Covid-19 screening.[1] The nursing staff was required to review the Medical Receiving Screening forms daily and to complete a Receiving Screening, also known as an initial intake evaluation, within 24 hours.

136.   The Receiving Screening was designed to determine an inmate's medical care needs, mental health care needs, and risk of suicide so that the inmate could be properly referred for a medical and/or mental health services and, if needed, placed on special watch.

137.   Contrary to the mandatory requirements for a Receiving Screening, Sheriff Tripp and Jail Administrator Foltz had an unwritten policy or custom which allowed detention officers and nursing staff to not complete the Receiving Screening forms if an inmate was agitated, aggressive, violent, disruptive, or uncooperative.

138.   The unwritten policy or custom at the Sheriff's Office was inadequate and made it more difficult for inmates with serious mental health needs to obtain appropriate medical and mental health services and supervision on special watch.

139.   Upon information and belief, Halifax County was aware of the unwritten policy or custom at the Sheriff's Office on Receiving Screening Forms and knew that it was inconsistent with the requirements in the Medical Plan at the Detention Center for the screening of inmates upon admission.

140.   Under Policy 10.03 ("Suicide Prevention") of the Medical Plan, one or more detention officers were required to check an inmate at least four times an hour

---

[1] The Medical Reviewing Screening Forms were also required by Policy 10.01 ("Health Care Services"), Policy 10.03 ("Suicide Prevention"), and Policy 10.04 ("Mental Health Care") of the Medical Plan.

when the inmate was placed on watch status as a suicide risk. Under Policy 4.05 ("Segregation of Inmates") of the Policies and Procedures Manual, inmates in administrative segregation were "best observed at least once every 60 minutes" and detention staff were permitted, but not required, to have "more frequent observations for medical/mental health segregation."

141.  Neither Halifax County nor Sheriff Tripp had a written policy in the Medical Plan or Policies and Procedures Manual which complied with 10A NCAC §14J.0601(c)(4) ("Supervision") by requiring special watch rounds at least four times an hour for an inmate who displayed any of the following behavior: "verbal abuse of other people; threatening other people, or threatening to or engaging in self-injury; screaming, crying, laughing uncontrollably, or refusing to talk." These behaviors are indicative of an individual who may have serious mental illness.

142.  Sheriff Tripp and Jail Administrator Foltz had an unwritten policy or custom which required detention officers to only complete supervision rounds two times an hour for an inmate who should be on special watch under §14J.0601(c)(4).

143.  The unwritten policy or custom was inadequate and violated the mandatory requirements for special watch rounds in the North Carolina Minimum Jail Standards. Inmates who displayed behaviors that were indicative of serious mental illness did not receive proper supervision and observation from detention officers at the Halifax County Detention Center and were subject to neglect. These inmates also did not receive regular monitoring by the medical/nursing staff in

26

violation of Policy 10.38 ("Health Evaluation of Inmates in Segregation") in the Medical Plan.

144. Under Policy 7.07 ("Medical Emergencies") of the Policies and Procedures Manual, the policy of the Sheriff's Office was "to provide emergency medical services to inmates that is consistent with community standards of health care." The Policy noted that the primary medical emergency resource was "local hospitals" and that the "Jail Administrator will compile a detailed emergency plan on providing emergency medical services to inmates."

145. Under Policy 10.36 ("Emergency Services") of the Medical Plan, Southern Health Partners, in consultation with the Jail Administrator, was required to "generate procedures to assure that emergency medical and psychiatric services are provided by the Halifax County Jail and Detention Center with efficiency and expediency on a 24-hour basis." The Policy noted that county emergency vehicles would be available to transfer an inmate to a local hospital emergency room when an inmate's condition "exceeds the medical capabilities of the Halifax County Jail and Detention Center."

146. Under 10A NCAC §14J.0101(20), an "emergency medical need" means a "medical condition that requires medical treatment as soon as noticed and that may not be deferred until the next scheduled sick call or clinic."

147. Policy 7.07 and Policy 10.36 were inadequate because they did not include appropriate policies and procedures to allow detention and nursing staff to determine and handle emergency medical and mental health needs.

27

148.   Neither Jail Administrator Foltz nor Southern Health Partners had a detailed emergency plan or procedures to allow detention staff and nursing staff to properly determine and handle emergency medical and mental health needs.

149.   Sheriff Tripp and Jail Administrator Foltz had an unwritten policy or custom that the Jail Administrator would determine, on a case-by-case basis, when and how an inmate at the Detention Center would receive emergency medical or mental health care.

150.   Due to the unwritten policy or custom at the Sheriff's Office, inmates with serious medical and mental health needs often did not receive emergency medical or mental health care until an imminent life or death situation existed.

151.   In addition, before the events in this case, Sheriff Tripp and Jail Administrator Foltz did not provide any in-service training to the detention officers at the Halifax County Detention Center on screening, identifying, and requesting medical or mental health services for inmates with serious mental illness, or determining and handling an emergency medical or mental health need.

## C.   Mr. McDonald is Detained Without Receiving any Medical and Mental Health Screenings or Evaluations

152.   At 9:24 a.m., on Tuesday, May 4, 2021, Mr. McDonald was arrested by the Roanoke Rapids Police Department and taken to the Halifax County Detention Center. He was charged with second degree burglary of shirts and socks belonging to an acquaintance and injury to real property by damaging a doorknob. Mr. McDonald was given a $500 secured bond.

28

153.     Mr. McDonald was in an acute psychotic state when he was arrested and brought to the Halifax County Detention Center on May 4.

154.     At 11:00 a.m., Mr. McDonald was booked and admitted to the Halifax County Detention Center.

155.     In connection with the booking process, Lieutenant Corey R. Johnson was responsible for completing the Medical Receiving Screening for Mr. McDonald, including the Officer Observations, Medical Observations, Medical Questionnaire, Mental Health Screening, and Covid-19 screening forms. The forms noted that he was 70 years old, 6'0" tall, and 270 pounds.

156.     In accordance with the unwritten policy or custom at the Sheriff's Office, Lieutenant Johnson did not complete the Medical Receiving Screening because Mr. McDonald was severely agitated and could not answer the questions.

157.     Lieutenant Johnson wrote "Inmate was agitated; questions could not be answered" on the Officer Observations form and did not complete the officer observation, medical observation, medical questionnaire, or mental health information.

158.     Lieutenant Johnson provided the Officer Observation form with his hand-written notation and Medical Observations, Medical Questionnaire, and Mental Health Screening forms to the Southern Health Partners nursing staff.

159.     Neither Lieutenant Johnson nor any of the detention staff completed the Medical Receiving Screening after May 4, 2021.

160.   Once he was admitted to the Detention Center, Mr. McDonald was assigned to Single Cell #2, a segregation cell near the booking area, control room, and medical unit.

161.   Single Cell #2 had a toilet, shower, and bunk. The cell had video surveillance which allowed the detention and nursing staff to watch Mr. McDonald on a video monitor at the control room.

162.   Mr. McDonald was placed in administrative segregation due to his medical and mental health needs and to protect himself and others.

163.   Throughout Mr. McDonald's detention, Jail Administrator Foltz, Chief Jailer Silvester Hardy, Lieutenant Johnson, and Lieutenant Gravino Lashuon Taylor knew that Mr. McDonald had mental health issues and needs and they kept him in administrative segregation.

164.   Defendants Foltz, Hardy, Johnson, Taylor, and the other detention staff did not document any of the required information for Mr. McDonald's administrative segregation in violation of Policy 4.05, and did not obtain the necessary medical evaluation or monitoring by medical/nursing staff in violation of Policy 10.38 of the Medical Plan.

165.   Mr. McDonald should have been placed by the detention staff on special watch while he was in administrative segregation and special watch supervision rounds should have been completed at least four times per hour.

30

166. In accordance with the unwritten policy or custom at the Sheriff's Office, supervision rounds were completed only two times per hour by a detention officer for Mr. McDonald while he was in administrative segregation.

167. On Wednesday, May 5, 2021, Bobbie Lowe, LPN saw Mr. McDonald in his cell. She had him sign a Consent for Treatment and obtained a physician's order for Lisinopril to treat his hypertension.

168. According to LPN Lowe, Mr. McDonald was severely agitated. He cursed and refused to take his Lisinopril medication in the morning and afternoon, and kicked the door all day. In addition, Mr. McDonald began flooding his cell with water from the shower on either May 4 or May 5.

169. In accordance with the unwritten policy or custom at the Sheriff's Office, LPN Lowe did not complete a Receiving Screening or initial intake evaluation for Mr. McDonald on May 5 due to his severe agitation.

170. Neither LPN Lowe nor any of the nursing staff completed a Receiving Screening or initial intake evaluation for Mr. McDonald after May 5, 2021 and Mr. McDonald was not referred for, and he did not receive, a medical or mental health evaluation.

171. Mr. McDonald was never placed by the detention staff or nursing staff on the mental health list for Correctional Behavioral Health to provide mental health services, and Correctional Behavioral Health was not contacted about his condition.

172. On May 6, 2021, LPN Lowe saw Mr. McDonald while passing out medications to inmates in the morning and afternoon. Mr. McDonald had a very

31

violent outburst, cursed, beat the cell door non-stop, and refused to take his Lisinopril medication in the morning.

173. According to LPN Lowe, later in the day, Mr. McDonald again flooded the cell with water from the shower, cursed at everyone, and refused to take his afternoon Lisinopril medication.

174. Mr. McDonald exhibited obvious signs of serious mental illness, including manic psychosis and delirium, during his interactions with LPN Lowe.

175. Manic psychosis and delirium are symptoms of bipolar disorder and schizophrenia.

176. LPN Lowe knew or strongly suspected that Mr. McDonald had a serious medical need. Despite her knowledge, LPN Lowe did not complete a Receiving Screening or a nursing assessment for Mr. McDonald, did not take his vital signs, and did not contact the Medical Team Administrator, Medical Director, mental health contractor, or any other health care provider about his condition.

177. LPN Jill Coston was aware that Mr. McDonald returned to the Detention Center on May 4 and was being held in Single Cell #2. LPN Coston saw Mr. McDonald while she was passing out medications during the morning and afternoon on May 7-10 and May 13, 2021.

178. LPN Kayla Shearin was also aware that Mr. McDonald was being held in Single Cell #2 and she saw him while passing out medications during the morning and afternoon on May 11-12 and May 14-15, 2021.

179.     Mr. McDonald refused his medications for Lisinopril, HCTZ, and Ibuprofen on May 9 (morning) and May 13 (all day).

180.     On May 13, 2021, the detention staff gave Mr. McDonald the opportunity to leave Single Cell #2 for recreation time, but he refused to respond.

181.     During this period, Mr. McDonald continued to exhibit obvious signs of serious mental illness, including manic psychosis and delirium, and he was experiencing a psychiatric emergency.

182.     Mr. McDonald displayed psychotic behaviors throughout the day and night, had violent outbursts, yelled and hollered, talked to people who were not present, stayed in the shower for extended time, flooded the cell with shower water, and defecated and urinated throughout the cell. Mr. McDonald had an altered mental state and he would often sit or lie on the cell floor in the water. He was also not regularly eating his meals.

183.     Detention Officer Damien F. Norfleet conducted supervision rounds twice an hour for Mr. McDonald and other inmates during the dayshift. Officer Norfleet was aware that Mr. McDonald was flooding his cell with shower water and banging on his cell. Officer Norfleet heard Mr. McDonald bang on his cell asking to be taken to the hospital, but he was not taken by the detention staff to the hospital.

184.     Officer Norfleet reported his observations about Mr. McDonald to Lieutenant Johnson.

185.     Lieutenant Johnson and Lieutenant Taylor each conducted supervision rounds and observed Mr. McDonald in Single Cell #2 at least six times per shift.

33

186.     LPN Coston talked with Jail Administrator Foltz and Chief Jailer Hardy about Mr. McDonald's shower use and LPN Shearin questioned why the detention staff had not shut off the water.

187.     On May 14, 2021, Jail Administrator Foltz made the decision to turn the water off and allow Mr. McDonald to shower every 48 hours for 15 minutes, and the decision was communicated to Chief Hardy, Lieutenant Johnson, and LPN Coston.

188.     The shower was not turned off by the detention staff and Mr. McDonald continued to run the water and flood the cell. Jail Administrator Foltz was aware that Chief Jailer Hardy went into the cell several times to mop up the water and dry off Mr. McDonald.

189.     Despite his serious medical needs, Mr. McDonald did not receive a nursing assessment and his vital signs were not taken until shortly before his death on May 19, 2021, and he was never seen by, or referred to, the Medical Team Administrator, Medical Director, or mental health contractor for medical or mental health services.

**D.     Mr. McDonald's Psychiatric Emergency Becomes a Medical Emergency**

190.     Mr. McDonald did not receive any treatment or care at the Detention Center for his psychiatric condition.

191.     Due to his untreated psychiatric condition, Mr. McDonald was suffering from insanity or diminished mental capacity and he lacked sufficient capacity to make or communicate important decisions about himself. He needed to be immediately sent to a hospital for emergency psychiatric care and treatment.

34

192. On Sunday, May 16, 2021, Mr. McDonald did not take his morning medications when offered by LPN Shearin and he did not eat any food or drink any fluids at breakfast, lunch, or dinner. He spent the entire day sitting on his bunk, rocking back and forth or hunched over.

193. At 10:36 p.m. on May 16, Mr. McDonald stood up from the bunk, walked to the shower, undressed, and entered. He remained sitting or lying naked on the floor of the shower or cell in cold water, feces, and urine for the next 20 hours.

194. On Monday, May 17, 2021 Mr. McDonald did not take any of his medications when offered by LPN Coston and he did not eat any food or drink any fluids at breakfast, lunch, or dinner. Officer Norfleet was aware that Mr. McDonald was not eating or drinking, and he reported the information to Lieutenant Johnson.

195. On May 17, Jail Administrator Foltz was informed that Mr. McDonald was still running the water in his cell, he was in the shower or on the floor, he would not get on his mattress, and he had stopped continually beating and banging in his cell.

196. At approximately 6:30 p.m. on May 17, 2021, Officer Norfleet notified Lieutenant Johnson that Mr. McDonald was lying on the shower floor and shaking uncontrollably.

197. Lieutenant Johnson went with Officer Norfleet to Single Cell #2 and saw that Mr. McDonald was lying on the floor shaking, and his hand was white in color from being in water.

198. Due to Mr. McDonald's condition, Lieutenant Johnson summoned LPN Coston and she went to the cell. LPN Coston saw Mr. McDonald sitting in the shower naked and shivering, and she heard him say he could not get up. She tried to talk with him but he was unable to respond.

199. When Lieutenant Johnson and Officer Norfleet pulled Mr. McDonald from the shower, Mr. McDonald became angry and they left him sitting naked on the floor of the cell in standing water. Lieutenant Johnson, Officer Norfleet, and LPN Coston then left Mr. McDonald in the cell without obtaining any medical treatment for him.

200. Mr. McDonald's medical condition was so obvious that LPN Coston and Lieutenant Johnson were either aware or strongly suspected that he had a serious medical need.

201. Despite her knowledge, LPN Coston did not assess Mr. McDonald's condition, did not take his vital signs, did not contact the Medical Team Administrator, Medical Director, or emergency medical services, and did not obtain any medical treatment for him.

202. LPN Coston did not create any notes or records from her interactions with Mr. McDonald on the evening of May 17 and she did not begin monitoring his condition or fluid intake and output.

203. Despite his knowledge, Lieutenant Johnson did not contact a healthcare provider or emergency medical services and did not obtain any medical treatment for Mr. McDonald.

36

204. Mr. McDonald sat or lay on the cell floor in water for three hours. At 9:52 p.m. on May 17, Mr. McDonald pulled himself up on the ledge of the shower and remained in the same position until the following morning.

205. During the nightshift on May 17-18, 2021, Lieutenant Taylor observed Mr. McDonald in the cell while completing at least six supervision rounds. Lieutenant Taylor and other detention officers unsuccessfully tried to get Mr. McDonald into his bed and he reported the information to Lieutenant Johnson at shift change. In addition, Mr. McDonald flooded the cell overnight and the floor stayed wet the next day.

206. Major Foltz was informed during shift change on the morning of May 18, 2021 that Mr. McDonald was naked on the floor of his cell, did not want to get dressed, and that the nightshift officers were unable to get him off the floor.

207. On Tuesday, May 18, 2021 Mr. McDonald did not take any of his medications when offered by LPN Coston and he did not eat any food or drink any fluids at breakfast, lunch, or dinner. LPN Coston was aware that Mr. McDonald was not eating.

208. Officer Norfleet and Lieutenant Johnson conducted supervision rounds for Mr. McDonald during the dayshift on May 18. Lieutenant Johnson was aware that Mr. McDonald was not taking his medications, eating food, or drinking fluids and he reported the information to Jail Administrator Foltz and Chief Jailer Hardy.

209. During the dayshift on May 18, 2021, Mr. McDonald was lying or sitting naked on the floor of the cell in water, feces, and urine. Officer Norfleet could smell the urine when he went into the cell.

210. Throughout the dayshift on May 18, Mr. McDonald's medical condition was so obvious that Jail Administrator Foltz, Chief Jailer Hardy, Lieutenant Johnson, and LPN Coston knew or strongly suspected that he had a serious medical need.

211. Despite their knowledge, these Defendants did not contact a healthcare provider or emergency medical services to obtain medical attention and treatment for Mr. McDonald, and LPN Coston did not contact the Medical Team Administrator, Medical Director, or mental health contractor.

212. At 5:00 p.m. on May 18, Mr. McDonald was sitting on the shower ledge, hunched over, with water on the floor. He stayed in the same spot for 12 hours into the nightshift.

213. During the nightshift, Lieutenant Johnson was informed by his detention staff about Mr. McDonald's condition and he observed Mr. McDonald when he conducted five supervision rounds before 5:00 a.m.

214. At 5:00 a.m., on Wednesday, May 19, 2021, Mr. McDonald collapsed from the ledge to the cell floor and laid naked in the water.

215. At 6:25 a.m., Lieutenant Taylor and two detention officers dragged and pushed Mr. McDonald through standing water in the cell and placed him on the side of the bunk with his back propped up. Mr. McDonald immediately slumped over.

38

216. Before the nightshift ended at 7:00 a.m., Mr. McDonald fell to the floor and lay on his right side partially under the bunk.

217. During the nightshift on May 18-19, 2021, Lieutenant Taylor conducted six supervision rounds and directly observed and interacted with Mr. McDonald.

218. Mr. McDonald's medical condition was so obvious that Lieutenant Taylor was either aware or strongly suspected that he had a serious medical need. Lieutenant Taylor also knew that the nursing staff was not present during the nightshift at the Detention Center and that Mr. McDonald would not receive medical care unless a health care provider or emergency medical services was contacted.

219. Despite his knowledge, Lieutenant Taylor did not contact a health care provider or emergency medical services to obtain medical attention and treatment for Mr. McDonald.

220. At or near the end of his shift on the morning of May 19, Lieutenant Taylor told a supervisor that Mr. McDonald needed to immediately see a nurse and, upon information and belief, he reported the same information to Lieutenant Johnson.

221. During the dayshift on May 19, Officer Norfleet conducted supervision rounds for Mr. McDonald twice an hour beginning at 7:00 a.m. and saw Mr. McDonald lying naked on the cell floor in water. Officer Norfleet reported his observations to Lieutenant Johnson and Lieutenant Johnson saw Mr. McDonald in the same position when he conducted his rounds between 7:04 and 7:15 a.m.

39

222.    At 7:52 a.m., Mr. McDonald did not move when a kitchen worker delivered a breakfast tray to his cell. Approximately 30 minutes later, Lieutenant Johnson entered Single Cell #2, observed Mr. McDonald unresponsive on the floor in water, and heard him moaning. Lieutenant Johnson removed the untouched breakfast tray and left the cell.

223.    After Chief Jailer Hardy arrived at the Detention Center around 8:15 a.m., Lieutenant Johnson informed him that Mr. McDonald was lying on the cell and had not eaten in five days. Chief Jailer Hardy reported the information to Jail Administrator Foltz and told him that McDonald needed to be sent to Central Prison Hospital for medical and mental reasons.

224.    Jail Administrator Foltz and Chief Jailer Hardy decided to ask the District Court to either unsecure Mr. McDonald's bond or issue a Safekeeping Order, but they did not contact a healthcare provider or emergency medical services to obtain medical care for Mr. McDonald.

225.    At 9:00 a.m., Mr. McDonald did not move when LPN Shearin went to Single Cell #2 to pass out medications. LPN Shearin saw Mr. McDonald lying on the floor and she knew he was in an altered mental state. LPN Shearin recorded that he refused his morning medications and temperature check, but she did not assess his condition, take his vital signs, or contact the Medical Team Administrator, Medical Director, LPN Coston, or any other health care provider.

226.    At 9:30 a.m., Lieutenant Johnson returned to the cell and observed that Mr. McDonald unresponsive and moaning in the same position on the cell floor.

227.    Around this time, Jail Administrator Foltz began drafting a Safekeeping Order and he went to Single Cell #2. Mr. McDonald was still lying on the cell floor and he was not responsive when Jail Administrator Foltz tried to talk with him.

228.    In the draft Safekeeping Order, Jail Administrator Foltz wrote:

1.    That the Defendant, Ronald Anthony McDonald is incarcerated in the Halifax County Jail and has been displaying psychotic behavior and poses a danger to himself and the jail staff. The defendant has threatened to assault medical and jail staff.

2.    That since he has been incarcerated, he has continuously refused to take his medication, talks to "people" that are not present. He refuses to be seen by mental health staff. He displays psychotic behaviors throughout the day and night. He has been on suicide watch. He has refused meal trays for 5 consecutive days. He continually kicks and bangs on the cell door, yells and hollers disrupting the peace and sanctity of the jail.

3.    That it is necessary that the Defendant be transferred to a State Prison Facility for proper Mental Health care inasmuch as the Halifax County Jail Facilities are inadequate to offer the proper treatment that is needed for the Defendant's care.

229.    Jail Administrator Foltz incorrectly wrote that Mr. McDonald had threatened to assault staff, that he refused to be seen by mental health staff, and that he had been on suicide watch.

230.    Jail Administrator Foltz knew that Mr. McDonald had a serious medical need. He correctly noted that Mr. McDonald had been displaying obvious signs of manic psychosis and delusions throughout his detention, had not been taking his medications, had not been eating, that he needed proper mental health care, and that the Detention Center was unable to provide proper treatment for his condition.

41

231. Despite his knowledge, Jail Administrator Foltz did not contact a healthcare provider or emergency medical services to obtain medical care for Mr. McDonald.

232. At approximately 10:44 a.m., Officer Norfleet told Lieutenant Johnson that Mr. McDonald was still lying in the same place on the floor under the cell bunk and that someone needed to check on him. Lieutenant Johnson went to the cell with Officer Norfleet, confirmed that Mr. McDonald had not moved, and heard him mumbling, moaning, and groaning.

233. At approximately 11:35 a.m., Transport Officer Hinton Lee Alston, a retired Captain at Caledonia Correctional Institution, saw Jail Administrator Foltz and two detention officers in the control room watching the video in Mr. McDonald's cell. Officer Alston watched the monitor and noticed that Mr. McDonald was moving and he could not determine if he was breathing.

234. Officer Alston independently went to Mr. McDonald's cell to make sure that he was still breathing and alive. When Officer Alston entered, Mr. McDonald was lying naked in water mumbling and muttering incomprehensible gibberish. He immediately notified Major Foltz and told him that Mr. McDonald was mumbling and speaking gibberish.

235. Throughout the morning on May 19, 2021, Jail Administrator Foltz, Chief Jailer Hardy, Lieutenant Johnson, and LPN Shearin knew or strongly suspected that Mr. McDonald had a serious medical need and that his medical condition was deteriorating.

42

236. Despite their knowledge, these Defendants did not contact a health care provider or emergency medical services to obtain medical attention and treatment for Mr. McDonald before 12:30 p.m. on May 19.

237. Jail Administrator Foltz knew about Mr. McDonald's medical condition and confinement in Single Cell #2, and he condoned the decisions by the detention and nursing staff to not complete a Medical Receiving Screening, to not refer McDonald for medical or mental health services, to hold him in segregation without medical approval or monitoring, and to not obtain any medical or mental health treatment for his care. He also condoned the decision by the detention staff to conduct supervision rounds two times per hour while Mr. McDonald was in administrative segregation.

## D. Mr. McDonald Goes Into Cardiac Arrest and Dies

238. At approximately 12:27 p.m. on May 19, 2021, District Court Judge Brenda Branch approved an unsecured appearance bond for Mr. McDonald and Lieutenant Johnson went to Single Cell #2 with the release papers. Mr. McDonald was still lying on the floor in water, unresponsive, and mumbling incoherently. Lieutenant Johnson grabbed Mr. McDonald's left arm and noticed that he was really cold and that the water was freezing.

239. Lieutenant Johnson informed Chief Jailer Hardy that Mr. McDonald did not want to get up. At the direction of the Chief Jailer, Lieutenant Johnson told LPN Shearin about McDonald's condition and asked her to check on him.

43

240. At 12:35 p.m., LPN Shearin went to the cell to check on Mr. McDonald. She saw Mr. McDonald on the floor lying naked on the floor under the cell bunk, which she described as "normal." She decided to check his blood glucose level due to his altered mental status and lack of food intake and to check his body temperature with an infrared thermometer. LPN Shearin determined that Mr. McDonald was hypoglycemic even though he was not diabetic and hypothermic with a body temperature under 92 degrees.

241. Jail Administrator Foltz and Chief Jailer Hardy went to the cell and saw Mr. McDonald. Jail Administrator Foltz talked with Chief Jailer Hardy and LPN Shearin about McDonald's condition and finally made the decision to call emergency medical services.

242. At 12:44 p.m., Detention Officer Edwards called 911 Communications at the direction of Jail Administrator Foltz and requested emergency medical services. Officer Edwards reported that Mr. McDonald, a 72-year-old man, was lying in the cell floor and will not move, and he has not eaten or drank in a few days, and that he is possibly hypothermic.

243. Halifax County EMS was immediately dispatched and responded to the Halifax County Detention Center within 10 minutes. The EMTs found Mr. McDonald with an altered level of consciousness, lying naked on his right side in a fetal position on the cell floor under the bunk in a pool of cold water, urine, and feces, approximately two inches deep. The detention staff told the EMTs that Mr. McDonald had been lying on the floor in the water for the past two days.

44

244. Mr. McDonald was severely hypoglycemic (blood glucose of 29), dehydrated, and hypothermic. His skin was cold to the touch, peeling, and bluish (cyanotic). Mr. McDonald's skin was so cold that the EMTs could not obtain his pulse, oxygen saturation levels, or temperature on their medical equipment. Mr. McDonald was struggling to breath and moaning without being able to speak.

245. At approximately 1:16 p.m., Mr. McDonald went into cardiac arrest with no respirations and no pulse after being loaded by the EMTs into the ambulance. CPR was immediately started and Mr. McDonald was given epinephrine, shocked two times with a defibrillator, and intubated.

246. At 8:53 a.m., Halifax County EMS arrived at Halifax Regional Medical Center in Roanoke Rapids and Mr. McDonald was brought into the Emergency Department. Mr. McDonald was in cardiac arrest (asystole) with severe hypoglycemia (blood glucose of 13), severe hypothermia (rectal temperature of 80 degrees), liver failure, kidney failure, and sepsis. He never regained consciousness.

247. At 3:00 p.m. on May 19, 2021, Mr. McDonald was pronounced dead by Dr. George A. Melone at Halifax Regional Medical Center.

248. Mr. McDonald died from complications due to hypoglycemia, hypothermia, and hypertension.

249. If Defendants had obtained appropriate medical attention and treatment for Mr. McDonald before 12:00 p.m. on May 19, 2021, Mr. McDonald would likely be alive. His psychosis and agitation would have been stabilized by a sedative medication and, if needed, an antipsychotic medication, and the medical staff would

45

have administered Glucagon and IV fluids, warmed his body, performed lab tests, and monitored his condition and recovery.

250.    At the time of his death, Mr. McDonald weighed 233 pounds. He had lost 37 pounds since May 4, 2019. In addition, a post-mortem autopsy showed that he had no undigested food in his stomach, multiple contusions and abrasions on his body, skin slippage over his right arm, and subdural and subarachnoid intracranial hemorrhages.

**FIRST CLAIM FOR RELIEF:**
**DELIBERATE INDIFFERENCE**
**TO SERIOUS MEDICAL NEEDS**
**BY INDIVIDUAL DEFENDANTS**

251.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

252.    Ronald Anthony McDonald was a pretrial detainee while he was in the custody of the Halifax County Sheriff's Office from May 4, 2019 through May 19, 2019.

253.    As a pretrial detainee at the Halifax County Detention Center, Mr. McDonald had substantive due process rights under the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs. *See Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992).

254.    At the time of his admission and throughout his detention at the Halifax County Detention Center, Mr. McDonald was in an acute psychotic state from bipolar disorder and/or schizophrenia and he was experiencing a psychiatric emergency.

255. By May 16, 2019, it was clear that Mr. McDonald's condition was worsening because he was in an altered mental state, not taking his blood pressure medications, and not eating or drinking. On and after May 16, 2019, Mr. McDonald was experiencing a medical emergency due to hypoglycemia, dehydration, hypothermia, and untreated hypertension.

256. Acute psychosis and delirium from bipolar disorder and schizophrenia are serious medical needs that can become life-threatening conditions and cause serious physical and mental harm if not properly treated.

257. Hypoglycemia, dehydration, hypothermia, and untreated hypertension are also serious medical needs that can become life-threatening conditions and cause serious physical and mental harm if not properly treated.

258. Mr. McDonald's mental health and medical conditions were so obvious that even a lay person would have easily recognized that he needed medical attention or treatment.

259. Mr. McDonald had serious medical needs while he was in the custody of the Halifax County Detention Center.

## A. Individual Detention Officers

260. Jail Administrator Foltz, Chief Jailer Hardy, Lieutenant Johnson, and Lieutenant Taylor directly observed Mr. McDonald on numerous occasions during his detention and were regularly given information about his condition, behavior, and confinement. They were also familiar with Mr. McDonald from his prior detention.

47

261. Based on their observations and knowledge of Mr. McDonald, Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor recognized that Mr. McDonald was mentally unstable and exhibiting symptoms of mental illness. After May 16, 2019, these Defendants recognized that he was not taking his medications, eating or drinking, and that his condition was deteriorating.

262. Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor were each aware or strongly suspected that Mr. McDonald had a serious medical need.

263. Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor knew that Mr. McDonald's mental health and medical conditions required medical attention and that substantial risks of serious harm existed to Mr. McDonald if his conditions were not treated.

264. Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor each purposefully failed to respond to Mr. McDonald's serious medical needs despite his actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.[2]

---

[2] In light of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "the Second, Seventh, and Ninth Circuits [have] adopted a completely objective standard for pretrial-detainee-medical-deliberate-indifference claims that requires showing that a reasonable officer would have recognized the serious medical condition and appreciated the excessive risk to the detainee's health." *Mays v. Sprinkle*, 992 F.3d 295, 301 n.4 (4th Cir. 2021) (*citing Darnell v. Pineiro,* 849 F.3d 17, 35 (2nd Cir. 2017); *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Castro v. County of Los Angeles*, 733 F.3d 1060, 1071 (9th Cir. 2016) (en banc). Although the Fourth Circuit has not yet adopted the objective standard, it should be applied in this case.

48

265. Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor each consciously or recklessly disregarded the substantial risks of serious harm to Mr. McDonald by not contacting a health care provider or emergency medical services to provide medical attention and treatment for him before 12:00 p.m. on May 19, 2021.

266. Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor were acting under color of state law during their interactions with Mr. McDonald at the Halifax County Detention Center.

267. Jail Administrator Foltz, Chief Hardy, Lieutenant Johnson, and Lieutenant Taylor acted with deliberate indifference to the serious medical needs of Mr. McDonald.

268. Defendants Foltz, Hardy, Johnson, and Taylor are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. McDonald's substantive due process rights.

**B.    Individual LPN Nurses**

269. LPN Lowe, LPN Coston, and LPN Shearin directly observed Mr. McDonald on numerous occasions during his detention and were given information about his condition, behavior, and confinement. LPN Lowe and LPN Coston were also familiar with Mr. McDonald from his prior detention.

270. LPN Lowe, LPN Coston, and LPN Shearin were each aware or strongly suspected that Mr. McDonald had a serious medical need.

271. LPN Lowe, LPN Coston, and LPN Shearin each knew that Mr. McDonald's mental health and medical conditions required medical attention and that substantial risks of serious harm existed to Mr. McDonald if his conditions were not treated.

272. LPN Lowe, LPN Coston, and LPN Shearin each purposefully failed to respond to Mr. McDonald's serious medical needs despite her actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.

273. LPN Lowe, LPN Coston, and LPN Shearin each consciously or recklessly disregarded the substantial risks of serious harm to Mr. McDonald by:

    a. Failing to complete a Receiving Screening or initial intake evaluation;

    b. Failing to assess his condition and take his vital signs;

    c. Failing to refer him for a medical and mental health evaluation;

    d. Failing to place him on the mental health list for Correctional Behavioral Health to provide mental health services;

    e. Failing to contact the Medical Team Administrator, Medical Director, mental health contractor, emergency medical services, or another health care provider about his condition;

    f. Failing to obtain any medical or mental health treatment for him; and,

    g. Otherwise neglecting Mr. McDonald and failing to treat his mental health and medical conditions.

274. In addition, LPN Coston consciously or recklessly disregarded the substantial risks of serious harm to Mr. McDonald by:

    a. Failing to document his condition on May 7-10, 13, and 17-18, 2021;

50

b. Failing to take any action for Mr. McDonald's health, safety, and welfare after observing him on the evening of May 17, 2021;

c. Failing to monitor his condition and fluid intake and output on and after May 17, 2021;

d. Allowing Mr. McDonald to lie and sit naked on the cell floor in water for extended periods of time;

e. Failing to ensure that his condition was medically monitored by the nursing staff after she stopped providing care on May 18, 2021; and,

f. Failing to follow-up with the detention and nursing staff about Mr. McDonald's condition after she left the Detention Center on May 18, 2021.

275. LPN Shearin also consciously or recklessly disregarded the substantial risks of serious harm to Mr. McDonald by:

a. Failing to document his condition on May 11-12, 14-16, 2021 and the morning of May 19, 2021;

b. Failing to take any action for Mr. McDonald's health, safety, and welfare after observing him on May 16, 2021 and the morning of May 19, 2021;

c. Failing to check his blood glucose levels and to administer Glucagon and treat his hypoglycemia before 12:00 p.m. on May 19, 2021; and,

d. Allowing Mr. McDonald to lie and sit naked on the cell floor in cold water for extended periods of time.

276. The nursing care provided by LPN Lowe, LPN Coston, and LPN Shearin was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and be intolerable to fundamental fairness.

277. LPN Lowe, LPN Coston, and LPN Shearin were acting under color of state law when they each provided nursing care to Mr. McDonald at the Halifax County Detention Center.

51

278. LPN Lowe, LPN Coston, and LPN Shearin acted with deliberate indifference to the serious medical needs of Mr. McDonald.

279. Defendants LPN Lowe, LPN Coston, and LPN Shearin are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. McDonald's substantive due process rights.

**SECOND CLAIM FOR RELIEF:**
**POLICY OR CUSTOM OF DELIBERATE INDIFFERENCE**
**BY DEFENDANTS HALIFAX COUNTY AND SHERIFF DAVIS**

280. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

281. At the time of the events in this case, Halifax County had a Health Services Agreement with Southern Health Partners to provide medical and mental health services to inmates at the Detention Center, including the services of a Qualified Mental Health Professional.

282. Halifax County and Sheriff Tripp were aware that Southern Health Partners was not providing any mental health services to inmates at the Detention Center and did not have a Qualified Mental Health Professional. As a result, Halifax County had a Service Contract with Correctional Behavioral Health to provide limited mental health services to inmates.

283. Halifax County had a Medical Plan that was approved in 2013 and had not been updated to comply with the 2018 NCCHC Standards for Health Services in Jails or the new North Carolina Minimum Jail Standards, effective September 4, 2020.

284. In addition, Sheriff Tripp had a Policies and Procedures Manual at the Detention Center with policies and procedures that were approved in 2014 and 2016 and had not been updated to comply with the new North Carolina Minimum Jail Standards.

285. On and before May 19, 2021, Halifax County and Sheriff Tripp knew that:

a. A significant number of inmates at the Halifax County Detention Center had mental health issues and needed to receive appropriate services and treatment, including emergency medical care;

b. Correctional Behavioral Health did not have any mental health staff present at the Detention Center and it provided mental health services to inmates by videoconference only;

c. Correctional Behavioral Health was not responsible for providing mental health services to inmates until it received a mental health list from the medical/nursing or detention staff at the Detention Center

d. There were no mental health providers at the Detention Center and mental health services would only be provided to inmates if the inmate was referred for mental health services and placed by the nursing or detention staff on the mental health list for Correctional Behavioral Health;

e. Detention officers and nursing staff were not required to complete the Receiving Screening forms if an inmate was agitated, aggressive, violent, disruptive, or uncooperative;

f. Inmates with serious mental health needs would not be referred for mental health services unless a medical or mental health screening was completed;

g. There were no written policies requiring detention officers to complete special watch rounds at least four times an hour for an inmate who should be on special watch under 10A NCAC §14J.0601(c)(4);

53

h. Detention officers were allowed to only complete supervision rounds two times an hour for an inmate who should be on special watch under §14J.0601(c)(4);

i. Inmates who displayed behaviors that were indicative of serious mental illness did not receive proper supervision and observation from detention officers and did not receive regular monitoring by the medical/nursing staff in violation of Policy 10.38 ("Health Evaluation of Inmates in Segregation") in the Medical Plan;

j. The Medical Plan and Policies and Procedures Manual did not have appropriate policies and procedures to allow detention and nursing staff to determine and handle emergency medical and mental health needs;

k. The Jail Administrator would determine, on a case-by-case basis, when and how an inmate at the Detention Center would receive emergency medical or mental health services; and,

l. Inmates with serious medical and mental health needs often did not receive emergency medical or mental health care until an imminent life or death situation existed.

## A. Halifax County

286. Halifax County was aware that the Health Services Agreement and Medica Plan provided inadequate medical and mental health care, medical supervision, and emergency medical care for inmates with serious mental illness and emergency medical needs at the Detention Center.

287. Halifax County approved or condoned the policies or customs at the Detention Center and did not have a Medical Plan that provided adequate medical and mental health care, medical supervision, and emergency medical services for inmates with serious mental illness and emergency medical needs.

288. Through its approval of the policies or customs at the Detention Center, inadequate medical plan, and contractual relationship with Southern Health

54

Partners, Halifax County had an official policy or custom of deliberate indifference to the serious medical needs of inmates, like Ronald McDonald, with serious mental illness and emergency medical needs.

289. Halifax County's official policy or custom was a cause of, and the moving force behind, the violation of Mr. McDonald's right to be free from deliberate indifference to his serious medical needs.

**B.   Sheriff Davis as the Successor to Sheriff Tripp**

290. Sheriff Tripp approved the unwritten policy or custom on Medical Receiving Screening forms, the unwritten policy or custom on supervision rounds for inmates who should be on special watch under §14J.0601(c)(4), and Policy 7.07 on Medical Emergencies.

291. The Sheriff's official policies or customs were inadequate because they did not provide appropriate medical and mental health care to inmates at the Detention Center with serious medical needs and emergency medical needs.

292. Sheriff Tripp authorized the Jail Administrator to establish policy on the Sheriff's behalf at the Detention Center and to determine the procedures that would be followed by the detention officers.

293. At the time of the events in this case, Sheriff Tripp had appointed Major Foltz to serve as the Jail Administrator at the Detention Center. Jail Administrator Foltz was acting as the final decisionmaker for the Sheriff on the policies and procedures for determining when and how an inmate would receive emergency medical or mental health care.

55

294. In addition, Sheriff Tripp and Jail Administrator Foltz failed to provide adequate training to detention officers on screening, identifying, and requesting medical or mental health services for inmates with serious mental illness, or determining and handling an emergency medical or mental health need.

295. Sheriff Tripp's failure to provide adequate training to the detention officers showed a deliberate indifference to the rights of inmates at the Detention Center, including Ronald McDonald.

296. Sheriff Tripp had official policies and/or customs of deliberate indifference to the serious medical needs of inmates, like Mr. McDonald with serious mental illness and emergency medical needs.

297. The individual Defendants acted in accordance with the Sheriff's policies or customs through their deliberate indifference to the serious medical needs of Mr. McDonald.

298. Sheriff Tripp and/or Jail Administrator Foltz condoned the decisions by the detention officers and nursing staff to not complete the Receiving Screening forms, to not refer Mr. McDonald for mental health or medical services, to not properly supervise and monitor his condition in segregation, and to not obtain any emergency medical treatment for him until an imminent life or death situation existed.

299. Sheriff Tripp's official policies and/or customs were a cause of, and the moving force behind, the violation of Mr. McDonald's right to be free from deliberate indifference to his serious medical needs.

56

300.   Sheriff Davis, as the successor to Sheriff Tripp, is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policies or customs which caused Mr. McDonald's substantive due process rights to be violated at the Halifax County Detention Center.

### THIRD CLAIM FOR RELIEF:
### ACTION ON OFFICIAL BOND AGAINST
### DEFENDANTS SHERIFF DAVIS AND
### WESTERN SURETY COMPANY

301.   The allegations set forth in the preceding paragraphs are incorporated herein by reference.

302.   On November 14, 2018, Sheriff Tripp procured an official bond as principal from Western Surety in the sum of $25,000 for his term beginning on December 3, 2018 and ending on December 3, 2022.

303.   Western Surety Company joined with Sheriff Tripp as surety in the execution of the official bond and thereby undertook to be jointly and severally liable for the failure of Sheriff Tripp and his detention officers to faithfully perform the duties of his office as Sheriff of Halifax County.

304.   Sheriff Tripp' official bond was in full force and effect on May 4-19, 2021.

305.   Jail Administrator Foltz, Chief Jailer Hardy, Lieutenant Johnson, and Lieutenant Taylor were acting within the course and scope of their employment as Halifax County detention officers and under color of Sheriff Tripp' office during their interactions with Mr. McDonald on May 4-19, 2021.

306.   The acts and omissions of Jail Administrator Foltz, Chief Jailer Hardy, Lieutenant Johnson, and Lieutenant Taylor, as alleged in this action and imputed to

57

Sheriff Tripp under the doctrine of *Respondeat Superior*, constituted neglect, misconduct, misbehavior, and/or a breach of their official duties as detention officers.

307.    Sheriff Davis, as the successor to Sheriff Tripp, and Western Surety Company are jointly and severally liable to Plaintiff, pursuant to N.C. Gen. Stat. § 58-76-5, for Mr. McDonald's personal injuries and wrongful death to the extent of the official bond.

**FOURTH CLAIM FOR RELIEF:**
**MEDICAL MALPRACTICE BY**
**DEFENDANTS LPN LOWE, LPN COSTON, LPN SHEARIN,**
**AND SOUTHERN HEALTH PARTNERS**

308.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

309.    During their care of Ronald McDonald, LPN Lowe, LPN Coston, and LPN Shearing each had a duty to use her best judgment, to use reasonable care and diligence in the application of her knowledge and skill to Mr. McDonald's care, and to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities.

310.    At a minimum, LPN Lowe was negligent and breached her duty of care to Mr. McDonald by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. McDonald's care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities, including by:

58

a. Failing to complete a Receiving Screening or initial intake evaluation;

b. Failing to assess his condition and take his vital signs;

c. Failing to refer him for a medical and mental health evaluation;

d. Failing to place him on the mental health list for Correctional Behavioral Health to provide mental health services;

e. Failing to place him on the Chronic Care list;

f. Failing to properly monitor his condition in administrative segregation;

g. Failing to contact the Medical Team Administrator, Medical Director, mental health contractor, LPN Coston, emergency medical services, or another health care provider about his condition;

h. Failing to obtain any medical or mental health treatment for him;

i. Failing to ensure that Mr. McDonald's condition was medically monitored by the nursing staff after she stopped providing care;

j. Failing to follow the pertinent policies and procedures at the Detention Center; and,

k. In such further ways as may be shown by the evidence.

311. At a minimum, LPN Coston was negligent and breached her duty of care to Mr. McDonald by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. McDonald's care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities, including by:

a. Failing to complete a Receiving Screening or initial intake evaluation upon determining that a medical and mental health screening had not been completed;

b. Failing to assess his condition and take his vital signs;

59

c.  Failing to refer him for a medical and mental health evaluation;

d.  Failing to place him on the mental health list for Correctional Behavioral Health to provide mental health services;

e.  Failing to place him on the Chronic Care list;

f.  Failing to properly monitor his condition in administrative segregation;

g.  Failing to contact the Medical Team Administrator, Medical Director, mental health contractor, emergency medical services, or another health care provider about his condition;

h.  Failing to obtain any medical or mental health treatment for him;

i.  Failing to document his condition on May 7-10, 13, and 17-18, 2021;

j.  Failing to take any action for the health, safety, and welfare of Mr. McDonald after observing him on the evening of May 17, 2021;

k.  Failing to monitor his condition and fluid intake and output on and after May 17, 2021;

l.  Failing to recognize the signs and symptoms of acute decompensation and a medical emergency on and after May 17, 2021;

m. Failing to check his blood glucose levels and to administer Glucagon and treat his  hypoglycemia;

n.  Allowing Mr. McDonald to lie and sit naked on the cell floor in water for extended periods of time;

o.  Allowing him to develop severe hypoglycemia, dehydration, and hypothermia;

p.  Failing to ensure that his condition was medically monitored by the nursing staff after she stopped providing care on May 18, 2021;

q.  Failing to follow-up with the detention and nursing staff about his condition after she left the Detention Center on May 18, 2021;

r.  Failing to follow the pertinent policies and procedures at the Detention Center; and,

s. In such further ways as may be shown by the evidence.

312. At a minimum, LPN Shearin was negligent and breached her duty of care to Mr. McDonald by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. McDonald's care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities, including by:

a. Failing to complete a Receiving Screening or initial intake evaluation upon determining that a medical and mental health screening had not been completed;

b. Failing to assess his condition and take his vital signs;

c. Failing to refer him for a medical and mental health evaluation;

d. Failing to place him on the mental health list for Correctional Behavioral Health to provide mental health services;

e. Failing to place him on the Chronic Care list;

f. Failing to properly monitor his condition in administrative segregation;

g. Failing to contact the Medical Team Administrator, Medical Director, mental health contractor, LPN Coston, emergency medical services, or another health care provider about his condition;

h. Failing to obtain any medical or mental health treatment for him;

i. Failing to document his condition on May 11-12, 14-16, 2021 and the morning of May 19, 2021;

j. Failing to take any action for the health, safety, and welfare of Mr. McDonald after observing him on May 16, 2021 and the morning of May 19, 2021;

k.  Failing to recognize the signs and symptoms of acute decompensation and a medical emergency on the morning of May 19, 2021;

l.  Failing to check his blood glucose levels and to administer Glucagon and treat his  hypoglycemia before 12:00 p.m. on May 19, 2021;

m.  Allowing Mr. McDonald to lie and sit naked on the cell floor in cold water for extended periods of time;

n.  Allowing him to develop severe hypoglycemia, dehydration, and hypothermia;

o.  Failing to follow the pertinent policies and procedures at the Detention Center; and,

p.  In such further ways as may be shown by the evidence.

313.   LPN Lowe, LPN Coston, and LPN Shearin were each grossly negligent in providing care to Mr. McDonald because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. McDonald, and (e) intentionally failed to comply with her duties as a licensed practical nurse.

314.   Defendants Lowe, Coston, and Shearin are liable to Plaintiff for medical malpractice in their care of Mr. McDonald.

315.   LPN Pope, LPN Coston, and LPN Shearin were each employed by Southern Health Partners and acting within the course and scope of her employment when she provided nursing care to Mr. McDonald at the Halifax County Detention Center.

316. Defendant Southern Health Partners is vicariously liable to Plaintiff, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice by LPN Lowe, LPN Coston, and LPN Shearin.

317. In the alternative, if LPN Pope was an independent contractor, Southern Health Partners held itself out as providing nursing services to inmates at the Detention Center. Mr. McDonald looked to Southern Health Partners and not to LPN Lowe to perform these services and accepted the services in the reasonable belief that they were being rendered by Southern Health Partners or its employees.

318. Southern Health Partners never notified Mr. McDonald that LPN Lowe was an independent contractor. Mr. McDonald did not have the opportunity to make an informed decision to accept or reject LPN Lowe's services and he did not have any choice in the selection of a provider for nursing services at the Detention Center.

319. LPN Lowe was the apparent agent of Southern Health Partners if she was not an employee when providing nursing care to Mr. McDonald.

320. In the alternative, Defendant Southern Health Partners is vicariously liable to Plaintiff, pursuant to the doctrine of apparent agency, for the medical malpractice by LPN Lowe.

321. At the time of the events alleged herein, the arrangement or provision of health care services by Southern Health Partners, LPN Lowe, LPN Coston, and LPN Shearin was not impacted, directly or indirectly, by (a) their decisions or activities in response to or as a result of the COVID-19 pandemic; or (b) by the decisions or activities, in response to or as a result of the COVID-19 pandemic, of a

health care facility or entity where a health care provider provides health care services.

322. Southern Health Partners, LPN Lowe, LPN Coston, and LPN Shearin are not entitled to any immunity under N.C. Gen. Stat. § 90-21.133. Furthermore, this immunity does not apply to Plaintiff's claims for gross negligence.

## FIFTH CLAIM FOR RELIEF:
### CORPORATE NEGLIGENCE BY DEFENDANT SOUUTHERN HEALTH PARTNERS

323. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

324. At all times relevant to this action, Southern Health Partners had a duty to use reasonable care in performing its corporate policy, management, and/or administrative functions and decisions such as hiring, credentialing, supervising, staffing, and retaining its employees and independent contractors at the Halifax County Detention Center.

325. At all times relevant to this action, Southern Health Partners was aware that LPN Lowe, LPN Coston, and LPN Shearin were not fit to provide all of the nursing care at the Halifax County Detention Center to an inmate with serious mental illness and emergency medical needs, like Mr. McDonald, because they lacked the necessary skills, training, and experience, and were inadequately supervised by the Medical Team Administrator or Medical Director.

326. Southern Health Partners was negligent and breached its duty of care to Mr. McDonald by:

64

a. Requiring Dr. DeVaul to only visit the Detention Center on a weekly basis for up to two hours;

b. Requiring Nurse Tanner, as Medical Team Administrator, to only visit the Detention Center on a weekly basis for up to four hours;

c. Allowing nursing care for inmates with serious mental illness and emergency medical needs to be provided by licensed practical nurses without appropriate onsite medical supervision;

d. Failing to hire and employ a proper number of medical and nursing staff;

e. Failing to properly monitor and supervise the performance of LPNs at the Detention Center

f. Failing to properly train the LPNs on screening, assessing, and obtaining treatment for inmates with serious mental illness;

g. Failing to have proper policies to allow LPNs to determine and handle an emergency medical need for an inmate with serious mental illness; and,

h. In such further ways as may be shown by the evidence.

327.   Southern Health Partners is liable to Plaintiff for corporate and administrative negligence that caused Mr. McDonald's personal injuries and wrongful death at the Detention Center.

## DAMAGES

328.   As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, and negligence, Ronald Anthony McDonald suffered severe personal injuries throughout his pretrial detention at the Halifax County Detention Center from the deterioration of his medical and mental health, including manic psychosis, delusions, severe agitation, altered mental status, hypoglycemia, dehydration, hypothermia, and abrasions and contusions.

329. Due to his personal injuries. Mr. McDonald experienced physical pain, mental suffering, and mental anguish.

330. Mr. McDonald also experienced disability, handicap, inconvenience, and hardship from the loss of use of his body and mind due to his physical injuries and the deterioration of his medical and mental condition.

331. Plaintiff, as the Administrator of the Estate of Ronald Anthony McDonald, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. McDonald's personal injuries under N.C. Gen. Stat. § 28A-18-1.

332. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, and negligence, Mr. McDonald died on May 19, 2021.

333. Mr. McDonald would be alive if Defendants had obtained appropriate medical attention and treatment for his serious medical needs.

334. Mr. McDonald was 70 years old at the time of his death.

335. Mr. McDonald was survived by two brothers and the lineal descendants of his deceased sister and brother, who are his sole heirs under the North Carolina Intestate Succession Act, N.C. Gen. Stat. § 29-1, *et seq.*

336. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, and negligence, Plaintiff, as the Administrator of the Estate of Ashley Hurl McDonald, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

    a. Expenses for the care, treatment, and hospitalization of Mr. McDonald incident to the injury and conditions resulting in death;

    b. Compensation for the pain and suffering of Mr. McDonald;

    c. The reasonable funeral expenses of Mr. McDonald;

    d. The present monetary value of Mr. McDonald to his daughters of the reasonably expected:

        i. Services, protection, care, and assistance of Mr. McDonald, whether voluntary or obligatory, to his daughters; and,

        ii. Society, companionship, comfort, guidance, kindly offices, and advice of Mr. McDonald to his daughters.

337. Plaintiff, as the Administrator of the Estate of Ronald Anthony McDonald, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. McDonald's wrongful death under N.C. Gen. Stat. § 28A-18-2.

338. The acts of deliberate indifference to Mr. McDonald's serious medical needs by Defendants Foltz, Johnson, LPN Coston, and LPN Shearin were done with reckless or callous indifference to Mr. McDonald' civil rights. Plaintiff is entitled to recover punitive damages from these Defendants under 42 U.S.C. § 1983.

339. Plaintiff is also entitled to recover reasonable attorneys' fees and litigation expenses from Defendants (excluding Western Surety Company) pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from Defendants, jointly and severally, for Mr. McDonald's personal injuries and wrongful death;

2. Punitive damages from Defendants Foltz, Johnson, Coston, and Shearin under 42 U.S.C. § 1983;

3. Reasonable attorney's fees and litigation expenses from Defendants (excluding Western Surety Company) under 42 U.S.C. § 1988;

4. Costs of court and interest as allowed by law;

5. A trial by jury on all disputed issues of fact; and,

6. Such other and further relief as the Court may deem just and proper.

This the 18th day of May, 2023.

<u>/s/ Carlos E. Mahoney</u>
Carlos E. Mahoney
Mills & Mahoney, P.A.
P.O. Drawer 3865
Durham, NC 27702-3865
Telephone: 919-683-2135
Facsimile: 919-688-9339
cmahoney@gmfm-law.com
N.C. State Bar No. 26509
Counsel for Plaintiff